Maria VILLEGAS, et al., Appellants,

v.

GRIFFIN INDUSTRIES, et al., Appellees.

No. 13–95–435–CV.

Court of Appeals of Texas,
Corpus Christi.

Aug. 20, 1998.

Willard G. Holgate, Altoona, for Appellant.

Diane M. Henson, Austin, Lev Hunt, Corpus Christi, for Appellee.

Before DORSEY, HINOJOSA and RODRIGUEZ, JJ.

## OPINION

HINOJOSA, Justice.

Appellant, Maria Villegas, individually and as representative of the estate of Jose Villegas, deceased, sued appellees, Griffin Industries, Inc., Larry Findley, Russell T. McNorton, Fermin Garza, David Gonzales, and Harry Villarreal, for malicious prosecution, false imprisonment, wrongful death, and other claims. The trial court granted appellees' motion for directed verdict on all claims. By seven points of error, appellant contends the trial court erred in granting appellees' motion for directed verdict and in denying her request for a bill of exceptions, motion for new trial, and motion to re-open the evidence. We affirm.

### Background

Jose Villegas and Maria Villegas lived together since 1967 and had five children. Jose's brother-in-law, Presidiano Trevino, operated a business purchasing and collecting used cooking grease from restaurants and re-selling it for use in the manufacture of cosmetics, animal feed, soap, and plastic explosives. Trevino had a contract for grease purchase and collection with a Grandy's Restaurant ("Grandy's") in Corpus Christi. Jose operated a similar business in which he was sometimes assisted by Maria. He also acted as a buyer and collector for Trevino and had, on several occasions, picked up used cooking grease at Grandy's for Trevino.

Griffin Industries, Inc. is a grease-rendering company based in Cold Springs, Kentucky, but doing business in Texas, among other states. Griffin contracts with restaurants to purchase and collect used cooking oil and provides large, square containers marked with Griffin's name. The containers are provided with locked interlaced wire grates on top which can only be opened with a special key carried by Griffin employees. The grates have interstices just wide enough to admit oil while filtering out rubbish like bones. Griffin contracted with Grandy's for grease purchase and collection. In 1990,

Larry Findley, Griffin's Director of Security, noted that Griffin was experiencing losses in several large Texas cities due to thefts of grease from Griffin's containers. In 1992, Griffin hired four Corpus Christi police officers, Russell T. McNorton, Harry Villarreal, Fermin Garza, and David Gonzales, to perform a private investigation of the thefts from restaurants in Corpus Christi.

To facilitate their investigation, the officers decided it would be more effective to identify and follow a grease collection truck rather than stake out a single Corpus Christi restaurant. In the early hours of October 1, 1992, the officers spotted a grease truck occupied by Jose and Maria. The officers followed the couple and watched as they stopped at several restaurants, maneuvered the truck beside enclosures behind the restaurants, and entered the enclosures. A Grandy's restaurant was located on the strip where Maria and Jose were operating. Two officers went ahead to examine the Griffin container in its enclosure behind Grandy's, while the other two continued to observe Maria and Jose at another restaurant, then left to take up observation posts at Grandy's. Jose and Maria arrived at Grandy's shortly thereafter to collect grease. Their actions were observed by the police officers. Officers McNorton and Gonzales arrested the couple for stealing grease from the Griffin container behind Grandy's.

Jose died suddenly on January 7, 1993, two months before the date set for his trial. Maria's trial was set for December 6, 1993, but the criminal charges were dismissed just before trial commenced. The criminal charges against Jose were dismissed on August 16, 1994, nineteen months after his death.

On September 22, 1994, Maria filed this suit against appellees. The trial commenced on June 13, 1995. Maria called appellees as adverse witnesses. At the close of Maria's case, appellees moved for a directed verdict on all of Maria's claims, and the trial court granted the motion.

### Directed Verdict: Standard of Review

■ A directed verdict is appropriate when reasonable minds can draw only one

conclusion from the evidence. *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978). In other words, where the plaintiff fails to present evidence in support of a fact essential to her right to recover or where a defense against the plaintiff's cause of action is conclusively proved or admitted, a directed verdict for the defendant is proper. *Arguelles v. UT Family Med. Ctr.,* 941 S.W.2d 255, 258 (Tex. App.—Corpus Christi 1996, no writ); *Davis v. Mathis,* 846 S.W.2d 84, 86 (Tex.App.—Dallas 1992, no writ). On review, we examine the evidence in the light most favorable to the party against whom the verdict was rendered and disregard all contrary evidence and inferences. *Qantel Bus. Sys. v. Custom Controls,* 761 S.W.2d 302, 303–04 (Tex.1988); *Arguelles,* 941 S.W.2d at 258. When reasonable minds may differ as to the truth of controlling facts, the issue must go to the jury. *Collora,* 574 S.W.2d at 68; *Arguelles,* 941 S.W.2d at 257–58.

### *Validity of Informal Marriage*

■ In addition to her individual claims against appellees, Maria brought this suit as the representative and beneficiary of the estate of Jose Villegas, and all of the claims she asserts depend on her status as Jose's common law spouse. Appellees, in their answer and in their motion for directed verdict, challenged Maria's capacity and standing to bring survivor and wrongful death actions because she was not, in fact, Jose's spouse. The trial court granted the motion for directed verdict.

By her third point of error, Maria contends she was Jose Villegas' common-law spouse, and thus, had the right to bring survival claims and a wrongful death action. Because disposition of this point of error bears on whether the remaining points are to be decided regarding Maria, individually, or in a dual capacity as an individual and representative of an estate, we will consider it first.

■ The civil practice and remedies code provides that causes of action for personal injury to health, reputation, or person survive beyond the death of the injured party. TEX. CIV. PRAC. & REM.CODE ANN. § 71.021(a) (Vernon 1997). The heirs, legal representatives, and estate of the deceased have standing to institute such actions. TEX. CIV. PRAC. & REM.CODE ANN. § 71.021(b) (Vernon 1997). For wrongful death, the persons who may bring an action are the surviving spouse, the children, and the parents of the deceased. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 71.004 (Vernon 1997); *Landers v. B.F. Goodrich Co.,* 369 S.W.2d 33, 35 (Tex. 1963). Jose Villegas died intestate. Under the probate code, his surviving spouse would be an heir and qualified to bring a survival action. TEX. PROB.CODE ANN. § 38(b) (Vernon 1980).

■ The main question concerning Maria's capacity centers on the validity of the informal marriage between Maria and Jose.[1] In order to constitute a valid informal marriage, it must be established that the parties: (1) entered into an expressed or implied agreement to become husband and wife, (2) that such agreement was followed by cohabitation as man and wife, and (3) that they held each other out professedly and publicly as husband and wife. TEX. FAM.CODE ANN. § 1.91(a)(2) (Vernon 1993).[2] There is, of course, one additional fundamental rule—that in order to establish a valid marriage, the parties must possess the legal capacity to marry and there must not be any legal impediment prohibiting the marriage contract.

---

1. At the time this case was tried, the family code provided that an informal marriage had to be proved within one year of its termination. TEX. FAM.CODE ANN. § 1.91 (Vernon 1993) (repealed). The statute of limitations is now two years. Act of April 17, 1997, 75th Leg., R.S., ch. 7, § 1, 1997 Tex. Sess. Law Serv. 15 (Vernon 1997) (current version at TEX. FAM.CODE ANN. § 2.401 (Vernon Pamph.1998)). The wrongful death statute requires a spouse to bring a cause of action within two years. TEX. CIV. PRAC. & REM. CODE ANN. §§ 16.003, 71.04 (Vernon 1997).

2. All family code provisions cited herein were repealed by Act of April 17, 1997, 75th Leg., R.S., ch. 7, § 1, 1997 Tex. Sess. Law Serv. 43 (Vernon 1997), and recodified. *See id.* at 8. Other than to increase the statute of limitations from one year to two, the recodification of former § 1.91 effected no substantial changes. *See id.* at 15.

*Franklin v. Smalldridge*, 616 S.W.2d 655, 657 (Tex.Civ.App.—Corpus Christi 1981, no writ); *Howard v. Howard*, 459 S.W.2d 901, 904 (Tex.Civ.App.—Houston [1st Dist.] 1970, no writ); *Esparza v. Esparza*, 382 S.W.2d 162, 166 (Tex.Civ.App.—Corpus Christi 1964, no writ).

 It is true there is a presumption that the most recent marriage of a party is the valid one, and this presumption continues until one proves the impediment of a prior marriage. TEX. FAM.CODE ANN. § 2.01 (Vernon 1993).[3] Maria testified that her informal marriage to Jose commenced with her first pregnancy. However, Maria admitted knowing that Jose was already married at the time she became pregnant with their first child, complained that he continued to financially support his first family to the detriment of herself and her children, spent substantial time apart from her, and admitted she did not know whether Jose's marriage to the other woman was dissolved prior to his death. Because Maria admitted knowing of Jose's existing marriage at the time she claimed to have contracted an informal marriage and was informed by appellees' pleadings that capacity to act as a surviving spouse was an issue, it became her responsibility to prove that the legal impediment to the establishment of a valid informal marriage had been removed sometime before Jose's death. *See Franklin*, 616 S.W.2d at 657–58.

 Informal marriages, like ceremonial marriages, can only be dissolved by legal proceedings decreeing annulment or divorce, or by the death of one spouse. *Claveria's Estate v. Claveria*, 615 S.W.2d 164, 167 (Tex. 1981) (common law divorce not recognized in Texas); *Ulloa v. Davila*, 860 S.W.2d 202, 203 (Tex.App.—San Antonio 1993, no writ). A marriage contracted while one party is married to another person is void *ab initio* as a matter of law, TEX. FAM.CODE ANN. § 2.22 (Vernon 1993);[4] *Home Indem. Co. v. Ed-*

*wards*, 488 S.W.2d 561, 563 (Tex.Civ.App.—Fort Worth 1972, writ ref'd n.r.e.), but an informal marriage will be recognized as beginning on the date the prior marriage is dissolved. TEX. FAM.CODE ANN. § 2.22.

Maria offered no evidence whatsoever to show that Jose's prior marriage had ended before his death. Because Maria failed to show that Jose had ended his previous marriage and was free to contract marriage with her, we conclude her marriage to Jose was void from its inception as a matter of law. *See id.*

 Maria urges that her application for widow's benefits from the Social Security Administration, submitted within one year of Jose's death, would prove her marriage to Jose. Recently, the Texas Supreme Court decided that the one year statute of limitations provided for in section 1.91 of the family code is to be strictly adhered to. *Shepherd v. Ledford*, 962 S.W.2d 28, 32 (Tex. 1998). When the one-year time period expires, and no proceeding to prove the existence of an informal marriage has been instituted, the party asserting the informal marriage is barred from proving it. *Id.* at 32–33. The supreme court also clarified that a proceeding to prove the existence of an informal marriage is one wherein the requisite elements under Texas law are established. *Id.* at 32.

Even in the absence of Maria's admission regarding Jose's previous marriage, there is nothing in the record to suggest that any of the elements required by Texas law had to be proven to obtain widow's benefits, nor that any sort of proceeding was conducted to establish the existence of those elements. Maria offered only to repeat what she had told the Social Security Administration and testify that she received benefits. We find this to be inadequate proof.

Because Maria was not Jose's surviving spouse, we conclude she had no standing to bring survival or wrongful death actions.

---

**3.** The recodification of former section 2.01 effected no substantial changes. *See* Act of April 17, 1997, 75th Leg., R.S., ch. 7, § 1, 1997 Tex. Sess. Law Serv. 8 (Vernon 1997); TEX. FAM.CODE ANN. § 6.202 (Vernon 1998).

**4.** The recodification of former section 2.22 effected no substantial changes. *See* Act of April 17, 1997, 75th Leg., R.S., ch. 7, § 1, 1997 Tex. Sess. Law Serv. 26 (Vernon 1997); TEX. FAM.CODE ANN. § 6.202 (Vernon Pamph.1998).

We hold the trial court did not err in granting a directed verdict on the survival and wrongful death actions. Maria's third point of error is overruled.

After appellees moved for a directed verdict on all causes of actions brought by Maria as representative and beneficiary of the estate of Jose Villegas on the basis that Maria lacked legal capacity to represent the estate and, moreover, had no standing to maintain an action for wrongful death, Maria attempted to re-open the evidence and offer two documents as evidence of her marital status as Jose's common-law wife. One was an unverified writing from Coastal Bend Legal Services opining that Maria's marriage was valid, and the other was Maria's own statement to the Social Security Administration regarding her marriage in applying for widow's benefits. The court refused to reopen the evidence and admit the documents. Maria asked to have the documents marked as exhibits and placed in the record. The court denied the request. At the hearing on her motion for new trial, Maria asked the court for permission to testify that she received social security benefits as Jose's widow as an offer of proof.[5] The trial court did not permit Maria to testify.

By her fourth point of error, Maria contends the trial court erred in denying her request to reopen the evidence and offer the documents. By her fifth and seventh points, Maria contends the trial court erred in refusing to allow her to make bills of exception at the trial and at the hearing on the motion for new trial respectively.

■■■ It is within the sound discretion of the trial court to refuse to allow the introduction of additional evidence after a party has rested its case. TEX.R. CIV. P. 270; *In re Estate of Johnson,* 886 S.W.2d 869, 873 (Tex. App.—Beaumont 1994, no writ) (duty to reopen arises if proffered evidence is decisive on issue); *McNamara v. Fulks,* 855 S.W.2d 782, 784 (Tex.App.—El Paso 1993, no writ)

(where plaintiff fails to exercise diligence and introduce evidence in a timely fashion, court does not abuse discretion in refusing to reopen); *White v. Daniel,* 391 S.W.2d 176, 180 (Tex.Civ.App.—Beaumont 1965, writ ref'd n.r.e.). Any error in refusing to permit Maria to make a bill of exception is harmless as the evidence proffered would make no difference in the outcome. *See Pennington v. Brock,* 841 S.W.2d 127, 131 (Tex.App.—Houston [14th Dist.] 1992, no writ) (record sufficient to apprise both trial court and appellate court of nature of evidence).

Because Maria's own admissions and failure to bear the evidentiary burden established that her marriage was void as a matter of law, and the record reflects that neither the documents nor additional testimony from Maria would have affirmatively shown that Jose's prior marriage had terminated before his death, we hold Maria's complaints are without merit. Accordingly, we overrule Maria's fourth, fifth, and seventh points of error.

### Malicious Prosecution

■■■ By her first point of error, Maria contends the trial court erred in granting a directed verdict on her malicious prosecution cause of action.

■■■ The plaintiff's burden in a malicious criminal prosecution claim is to establish: (1) the commencement of a criminal prosecution against the plaintiff, (2) causation (initiation or procurement) of the action by the defendant, (3) termination of the prosecution in the plaintiff's favor, (4) the plaintiff's innocence, (5) the absence of probable cause for the proceedings, (6) malice in filing the charge, and (7) damage to the plaintiff. *Richey v. Brookshire Grocery Co.,* 952 S.W.2d 515, 523 (Tex.1997); *see Coniglio v. Snyder,* 756 S.W.2d 743, 744 (Tex.App.—Corpus Christi 1988, writ denied). At issue in this appeal is whether Griffin had probable cause to urge the commencement of criminal proceedings against Maria.[6] The probable cause relevant

5. In a related case, Maria's social security income was shown to consist of disability payments and supplemental security income, but not survivor's benefits. *See Villegas v. Pate,* 913 S.W.2d 752, 754 (Tex.App.—Corpus Christi, orig. proceeding), *approved sub nom., Griffin Indus.,*

*Inc. v. Thirteenth Court of Appeals,* 934 S.W.2d 349 (Tex.1996).

6. The trial court commented that the element of plaintiff's innocence was not established, but this issue is not before us on appeal.

to a malicious prosecution claim in a case of theft is probable cause to believe that there has been a taking and the taking was intentional. *Richey*, 952 S.W.2d at 523.

■ Probable cause is defined as "the existence of such facts and circumstances as would excite belief in a reasonable mind, acting on the facts within the knowledge of the prosecutor, that the person charged was guilty of the crime for which he was prosecuted." *Richey*, 952 S.W.2d at 523 (citing *Akin v. Dahl*, 661 S.W.2d 917, 921 (Tex. 1983)). The probable cause determination asks whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted. *Richey*, 952 S.W.2d at 523 (citing *Akin*, 661 S.W.2d at 920–21; *Coniglio*, 756 S.W.2d at 744).

■ The initial presumption in malicious prosecution actions is that the defendant acted reasonably and in good faith and had probable cause to initiate the proceedings. *Ellis County State Bank v. Keever*, 888 S.W.2d 790, 794 (Tex.1994); *Akin*, 661 S.W.2d at 920. The presumption is discarded upon the plaintiff's production of evidence showing that the motives, grounds, beliefs, and other evidence upon which the defendant acted did not constitute probable cause. *Akin*, 661 S.W.2d at 920. The burden then shifts to the defendant to offer proof of probable cause. *Id.*

■ Whether probable cause is a question of law or a mixed question of law and fact depends on whether the parties dispute the underlying facts. *Id.* When the facts underlying the defendant's decision to prosecute are disputed, the trier of fact must weigh evidence and resolve conflicts to determine if probable cause exists, as a mixed question of law and fact. *Id.* It has long been true, however, that "[w]hen the facts are not contested, and there is no conflict in the evidence directed to that issue, the question of probable cause is a question of law which is to be decided by the court." *Ramsey v. Arrott*, 64 Tex. 320, 323 (1885); *see also Landa v. Obert*, 45 Tex. 539, 543 (1876)

("[w]hat facts and circumstances amount to probable cause is a pure question of law").

Maria contends there was no probable cause to support the prosecution for theft because the Griffin container was empty, therefore, no theft could have occurred and the defendants who claimed otherwise lied to the prosecuting officer. Two witnesses called by Maria, Corpus Christi Police Officers Russell T. McNorton and Harry Villarreal, testified that they used flashlights to look directly into the Griffin container on the night of October 1, 1992, and saw that it contained grease. After a close review of the record, we find no evidence contradicting this testimony.

Officer McNorton testified that, before Maria and Jose arrived at Grandy's, he looked inside the Griffin grease container with a flashlight and noted it was half full of used cooking oil. After Maria and Jose left Grandy's, Officer Villarreal used his flashlight to check inside the container. Villarreal saw that the tank was one-quarter full and still had a shiny residue line halfway up the tank. He further observed discolored "round bubbly matter" which he recognized as solidified grease near where the grate on top of the container had been cut, and that bubbles continued to rise from the bottom of the tank, indicating a recent disturbance.

Esta Paniagua, the restaurant's general manager on October 1, 1992, testified that the Griffin container was not used until the Grandy's area supervisor gave orders on some unspecified date for it to be used. However, she later qualified her statement by stating that no grease had been put in the Griffin container "to her knowledge" prior to October 6, 1992, and, if it was used, she "should have been informed." She did not unequivocally state that the container had never been used, but complained that she considered it inconvenient and dangerous to use and, for that reason, she preferred to use only the barrels provided by Trevino. She explained that oil from the cookers was filtered then pumped into the barrel which could be conveniently placed to receive the grease. Thereafter, the barrel could be rolled out of the way on a dolly. Admittedly, Paniagua was not always present when the

grease was changed, nor was the task always performed by the same person. She did not say unequivocally that another manager or employee had never put grease in the Griffin container or that it was impossible to do so. She complained only that she considered it too difficult to transfer grease from the barrels to the bin without a special transfer device which she did not obtain until October 6. She stated that the Griffin container had been delivered sometime in September, and she had looked in the container at least once prior to October 1 and observed that it was empty. Paniagua could not say if the date was close to October 1 and admitted she did not use a flashlight to see the bottom of the tank.

Even viewed in the most favorable light, Paniagua's testimony does not establish that there was not, and could not have been, used cooking oil in the Griffin container, only that she did not permit it to be used when she supervised oil disposal. She had no personal knowledge of its condition on October 1.

Maria did not deny that there was a Griffin tank in the enclosure on October 1, 1992. She testified only that she did not recall seeing it. Maria offered several photos. One photo shows a 55–gallon barrel beside the Griffin container, both placed by Grandy's back door. Two photos show a 55–gallon barrel of uncertain ownership partially filled with grease. All of the photos were taken after October 6, 1992. These photos suggest that Grandy's continued the practice of draining the oil from the cookers into the barrel and then transferred the oil to the Griffin container. They do not establish that a barrel of grease was outside Grandy's restaurant on October 1, 1992, nor do they suggest the Griffin container was empty on that date.

Dan Garcia, an attorney and Maria's nephew, went to the restaurant on October 1 or 2 to take photographs of the enclosure and the damaged grate on the tank, but admittedly did not look inside the Griffin tank to see if it was empty until after October 6.

The remaining facts are undisputed. Prior to Maria and Jose's arrival at Grandy's, the grate on the Griffin container was intact. Maria and Jose drove the grease truck to the restaurant on October 1, 1992, and parked by the enclosure containing the Griffin container. Maria and Jose entered the enclosure. Jose then came back out and passed the hose from the grease truck over the wall to Maria.[7] After Maria and Jose left the restaurant, witnesses discovered a portion of the grate on the container was cut away, leaving a hole large enough for the hose to enter. A pair of tin snips was recovered from the grease collecting truck after Maria and Jose were arrested.

All of the witnesses, with the exception of Maria, testified that they saw no barrels in the enclosure or elsewhere behind Grandy's on October 1, 1992. Maria claimed there was a barrel in the enclosure, but that neither she nor Jose was able to remove the lid to expose the grease.[8] She offered no explanation of why, after discovering the lid could not be removed, Jose passed the hose of the grease truck over the wall to her. Although the testimony concerning the presence or absence of a barrel is conflicting, it has no bearing on the issue of whether the Griffin tank contained grease.

Because the evidence establishes the definite presence of grease in the Griffin container, and the remaining facts surrounding the incident are undisputed, we hold the question of probable cause was a question of law, and the trial court could and did properly direct a verdict. Maria's first point of error is overruled.

### False Imprisonment

By her second point of error, Maria contends she was falsely imprisoned following her arrest by Officers McNorton and Gonzales. Although Maria's argument focus-

---

7. In a deposition, Maria testified that Jose had passed the hose over the wall to her. At trial, Maria testified that she could not recall if he had passed her the hose or not. All of the witnesses, except Maria, testified that they heard the pump's motor running up to two hundred yards away. Maria denied that the motor had been turned on.

8. Esta Paniagua testified that the grease barrels did not have lids, and no evidence of any barrel lids was offered.

es on the elements of false imprisonment, her complaint is actually one of false arrest as the justness of the resulting imprisonment depends on whether the officers had probable cause to effect an arrest. *See Whirl v. Kern,* 407 F.2d 781, 790 (5th Cir.1968) (false arrest is tantamount to effecting a false imprisonment), *cert. denied,* 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177 (1969). The elements of false arrest and false imprisonment are similar enough to be indistinguishable in the instant case. In order to establish civil liability for false arrest or false imprisonment, a plaintiff must show a wrongful interference with his freedom. *Montgomery Ward & Co. v. Garza,* 660 S.W.2d 619, 621 (Tex.App.—Corpus Christi 1983, no writ). The elements of false arrest or false imprisonment are a willful detention of the person, against the consent of the person, without authority of law. *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995); *Sears, Roebuck & Co. v. Castillo,* 693 S.W.2d 374, 375 (Tex.1985). Maria bore the burden to prove all three elements including the absence of authority. *Castillo,* 693 S.W.2d at 376.

Maria argues that the detention was without authority of law because the Griffin container was empty, and thus, no crime could be committed. Although Maria failed to prove the container was empty, we review the evidence to determine if Officers NcNorton and Gonzales lacked the authority to effect an arrest.

■ An off-duty officer who observes a crime immediately becomes an on-duty officer. *Wallace v. Moberly,* 947 S.W.2d 273, 277 (Tex.App.—Fort Worth 1997, no writ); *City of Dallas v. Half Price Books, Records, Magazines, Inc.,* 883 S.W.2d 374, 377 (Tex. App.—Dallas 1994, no writ). A peace officer may arrest an offender without a warrant for any offense committed in his presence or within his view. TEX.CODE CRIM. PROC. ANN. § 14.01(b) (Vernon 1977). Theft occurs when a person appropriates property without the effective consent of the owner. TEX. PENAL CODE ANN. § 31.03(b)(1) (Vernon 1994).

When hired by Griffin to investigate grease thefts, all four of the officers were informed that used cooking oil in Griffin con-

tainers was the property of Griffin Industries, had a value of about twelve cents per pound, and could be legally collected only by Griffin employees in clearly marked vehicles. Officers McNorton and Villarreal personally confirmed that the Grandy's enclosure contained a Griffin grease bin. McNorton observed that the tank was half full and the security grate was intact prior to the arrival of Maria and Jose. Neither officer saw any grease barrels in the enclosure, and none of the officers saw grease barrels anywhere on Grandy's outdoor premises. All four officers watched as the grease truck was parked by the enclosure surrounding the Griffin tank, and saw Maria and Jose enter the enclosure. Jose returned to the truck and passed the hose over the wall to Maria who was still inside. Thereafter, all four officers heard the hose's pump motor running for at least four minutes. Officer Villarreal observed "the hose surging back and forth, like if some material was being forced through it." Officer Garza testified that he could see "the hose jerking or surging ... as though some substance was being introduced into it." Immediately after Maria and Jose departed, Officer Villarreal checked the tank again, noted that the grate had been cut open, and observed approximately half the tank's contents were gone. Although not all of the officers personally inspected the enclosure and the tank, they shared the information among themselves. McNorton and Gonzales were fully informed of the before and after condition of the Griffin container. Based on this shared knowledge and personal observations, Officers McNorton and Gonzales reasonably believed a crime had been committed. We conclude the officers had authority to arrest Maria. *See Woodward v. State,* 668 S.W.2d 337, 344 (Tex.Crim.App.1982).

■ Generally, liability for false arrest or false imprisonment may extend to anyone who directs, requests, or participates in a detention, including the detention of a private citizen whom the defendant identifies as the perpetrator of a crime. *Smith v. Sneed,* 938 S.W.2d 181, 185 (Tex.App.—Austin 1997, no writ); *Bossin v. Towber,* 894 S.W.2d 25, 29 (Tex.App.—Houston [14th Dist.] 1994, writ denied). Neither Griffin Industries nor

Larry Findley had any role in the detention of Maria. There was no direction, request for, or participation in the detention. The decision to arrest was made by the off-duty officers. Neither Griffin nor Findley had any foreknowledge that the officers were observing Maria and Jose and only subsequently learned the details of their arrests.

Because Maria did not prove the officers lacked authority to detain her, we hold neither the arrest nor the detention was unlawful. We overrule her second point of error.

### Trial by Consent

The trial court granted appellees' motion for directed verdict on Maria's causes of action for malicious prosecution, false imprisonment, lack of capacity to sue on behalf of Jose, and her allegation of monopoly. By her sixth point of error, Maria contends she also brought causes of action for libel, slander, negligence/gross negligence, and tortious interference with a business contract/relationship and that none of these were disposed of by the directed verdict. Although Maria's petition does not plead these causes, Maria claims that evidence was adduced on each point without objections from the appellees, and thus, tried by consent.

In her pleadings, Maria contended appellees acted "to monopolize the business of reprocessing used grease, to limit competition, and to control prices." In argument to the trial court, Maria referred to her cause of action as "business monopoly." When the court asked what that meant, Maria was unable to explain, and the court granted a directed verdict on the cause of action.

 In oral argument on appeal, Maria contended the cause of action was for tortious interference with a contract. Assuming, *arguendo*, that Maria did plead such a cause of action, Maria also admitted that only Trevino had a contract with Grandy's for grease collection; neither Jose nor Maria had such a contract. *See Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 926 (Tex.1993) (essential element in cause of action for tortious interference is existence of a contract to be interfered with).

Alternatively, Maria contends that appellees' conduct caused her to lose her employment. Because Maria did not present any evidence she was an employee of either Jose Villegas or Presidiano Trevino, we conclude there was no business relationship subject to interference. *See Holloway v. Skinner*, 898 S.W.2d 793, 795–96 (Tex. 1995) (elements of tortious interference with employment contract). We hold the trial court did not err in granting appellees' motion for directed verdict on the issue of "business monopoly."

Insofar as any other "claims" that might be read into Maria's specifically pleaded causes of action, Maria responded to the trial court's query regarding any other matters before the court on directed verdict that appellees' motion for directed verdict covered all of her causes of action. Having waived all other theories of recovery, regardless of proof, we hold she cannot now claim that she either pleaded or tried by consent an action on any additional theories. *See Boyles v. Kerr*, 855 S.W.2d 593, 601 (Tex.1993). Maria's sixth point of error is overruled.

We affirm the judgment of the trial court.